### MTX COMMUNICATIONS CORPORATION, Plaintiff,

v.

### LDDS/WORLDCOM, INC., Defendant.

### No. 95 CIV 9569 RO.

United States District Court, S.D. New York.

Feb. 27, 2001.

Scott N. Gelfand, Meister Seelig & Fein LLP, Richard A. Roth, Littman Krooks Roth & Ball P.C., New York City, for plaintiff.

Richard I. Wolff, Carl A. Haberbusch, Law Office of Richard I. Wolff, P.C., New York City, for defendant.

### MEMORANDUM & ORDER

OWEN, District Judge.

This Memorandum and Order supplements, more than time and total analysis at the trial then permitted, my oral ruling during the trial on January 25, 2001, in which I declined to permit the testimony of plaintiff's purported expert William E. West III to be put before the jury. I assume familiarity with the trial record. Given the jury's finding that LDDS/World-Com's (hereinafter "WorldCom") single violation of the Federal Communications Act did not cause MTX any damage, West's testimony, even if it had been admitted and credited, related to an issue the jury never reached. However with an appeal possible, this Memorandum is required.

Plaintiff put West on the stand to give his opinion as to the growth and value MTX, a switchless reseller of WorldCom's services, would have achieved but for its alleged complications with defendant's services. Shortly into his testimony I excused the jury and counsel for both parties and the Court questioned him some two hours regarding his qualifications, methodology and the data he employed to formulate his report and opinion contained therein. As described in more detail hereafter, West's conclusions were based solely on MTX's opening years 1993 and 1994 customer bills (not MTX's receipts), conversations with MTX's management and information from a third-party Louisiana attorney, one Leon Nowalsky, about the growth and financial condition of three other switchless resellers.[1]

The law requires me to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Supreme Court's decision in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), makes clear that this "gate-keeping function applies not just to scientific expert testimony as discussed in *Daubert*, but also to testimony based on technical and other specialized knowledge ... [,]" *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91 (2d Cir.2000) (internal citations and marks omitted), including damage ex-

1. As discussed in more detail hereafter, West was never even given the name of one of these resellers.

perts like West. *See Nat'l Communications Association, Inc. v. American Tel. & Tel. Co.*, 1998 WL 118174, at *44–45 (S.D.N.Y. March 16, 1998). Trial judges have broad discretion to admit or exclude expert testimony subject to the manifestly erroneous rule. *See United States v. Amiry*, 15 F.3d 258, 261 (2d Cir.1994).

Thus, as gate-keeper, the Court must first determine whether West's proffered testimony rests on a reliable foundation— that is, whether his testimony is "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. As the Second Circuit stated, "[E]xpert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison ... [.]" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996) (internal marks omitted). Although my focus is on principles and methodology and not on West's conclusions, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The other, and second gate-keeping function is to determine whether West's proffered testimony is relevant and will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. It must not only have a reliable foundation but also be relevant in that it "fits" the facts of this case. *Daubert*, 509 U.S. at 591–592, 113 S.Ct. 2786.

■ West testified that in making his valuation of MTX, he used a brochure prepared by his consulting firm, Atlantic ACM, as an industry profile of small resellers like MTX. He also studied, through information provided to him by the Louisiana attorney, the development of companies which, the attorney stated, had similar experiences in the start-up stages to those of MTX; West called these "analog companies." The reason for studying analog companies, West stated, was to see "[h]ow [the analogs] behaved once ... they matured beyond the stage of MTX ... [.]" West then, using MTX's first two years billings, projected several future revenues to determine the "terminal value" of MTX in 1998 or 1999 had the company survived. Finally, he was asked to estimate profits for the years 1996 to 1998. Essentially, plaintiff asked West to assume defendant's liability and determine what the value of MTX would be but for what it alleged was the wrongful conduct of WorldCom.

Putting the general areas above aside, West's report is specifically based, as observed earlier, on three things: (i) MTX's 1993 and 1994 bills, not receipts; (ii) notes from conversations with Jeffrey Hermann, MTX's President, about the company's financial condition; and (iii) three conversations with Nowalsky, who ostensibly represented the analog resellers. To arrive at his valuation, West determined that gross 1993 and 1994 billings was the most appropriate measure of MTX as a "mid-size" player in the industry. Based upon its status as a mid-size reseller, he applied to the billings a "multiple" of "6.5" which he obtained from a report entitled, "The Telecom Service Provider: How Much Is It Worth?" published by a "Group IV." The report itself does not state that 6.5 is the multiple for switchless resellers, but West testified that he knows this to be true from talking to the book's author, Casey Friedman. West did not indicate how or why Friedman arrived at this multiple.[2]

2. As I observed during the examination of West, the Group IV publication contains not only a lengthy "Notice of Disclaimer of Liability" putting the information therein into question, but also contained an important qualification with respect to the multiple selected in valuing a telecommunications company at page 1.6. The qualification states:

West candidly acknowledges that he did not review MTX's profit/loss statements or balance sheets, statement of operations or whether the bills sent out to MTX customers were actually paid. A "true-up"—a reconciliation of the bills sent out with the monies actually paid—was never done. He also deemed it wholly irrelevant that the fact that the company was indeed insolvent under the balance sheet definition of insolvency (current liabilities exceed current assets), and, while he did consider competency of the management as affecting valuation (which competency was put in substantial question during the trial), he did not consider the value of MTX managers in his report. As was borne out on the witness stand, the information he obtained from the Louisiana attorney was less than compelling. West could only name two of the companies he called analogs.[3] The remaining company, he testified, was private and he never even knew its name or independently verified the information he received.[4]

Accordingly, I found and find West's proffered testimony neither reliable nor relevant. He ignored financials and quality of management, relied upon unverified information from a third-party attorney and employed unreasoned, untestable information from the author of the valuation chart in the Group IV report. Common sense and experience, as well as the flexibility afforded me by *Daubert* and its progeny, dictate that financials and quality of management—particularly of a start-up company—must be considered in valuing a company and its probability of success. It makes little, if no sense at all, to consider a company's lifeline in a vacuum. Every business, after all, is subject to economic downturns, managerial mistakes or, even, natural disaster. West's failure to include these factors, as well as to even consider learning how much actual money was taken in by MTX via a true-up, renders his valuation unreliable and unfit for the jury's consideration.

Further, one particular basis for West's opinion, in and of itself, renders the testimony inadmissible. The information from the Louisiana attorney was neither verified nor submitted in a way that permits meaningful review. There is no indication that Nowalsky was a source of accurate or reli-

---

It is important to point out that no range encompasses all transactions. One of our expert panelists sited [sic] his own experience with buyouts as low as 2.75 times monthly revenues and as high as 20+ times. However, there are common ranges that encompass most transactions.

The range set forth in this book appears completely arbitrary and West's testimony with respect to why he selected 6.5 as a the multiple is pure conjecture in light of the fact the Group IV publication itself makes no mention of the multiple applicable to switchless resellers like MTX. Indeed, West stated he relied on page 1.6. and, when confronted with the fact that the page makes no reference to switchless resellers, he asserted that he relied on the book's author. I add one more highly troublesome point on the issue of reliability of the Group IV report. In the preface, the report itself recognizes the speculative nature of telecommunications company valuations:

These transactions are deliberately clouded in mystery as part of a competitive game of cat and mouse. 'Smoke and mirrors' is how one expert put it. Ultimately, this [sic] drama of this statement landed our report

on the cover of one of the industry's leading magazines. Clearly, everyone was starved for information.

In my gate-keeping capacity, I feel cats and mice and smoke and mirrors are shaky, if any, foundations for expert opinions.

**3.** Unlike at trial, West could not name any of the so-called analog companies at his deposition on February 26, 1998. At said deposition, West also stated that he never checked whether MTX was insolvent and, moreover, never informed the Louisiana attorney of that fact. I find that troubling because it contradicts the very foundations of West's proffered testimony. West said that he sought out analog companies—that is, companies similar to MTX. It is significant that in Nowalsky's search for analogs, assuming only for the purposes of this observation that the resulting information is true and reliable, he never knew that MTX was insolvent, at least under the balance sheet definition of insolvency.

**4.** During his deposition, West confirmed that he spoke with Mr. Nowalsky "[n]o more than three times."

able expert information. The evaluation is, therefore, unreliable in that a major ingredient—information from the analogs which purports to shed light on where MTX would have been but for WorldCom's conduct—is itself lacking in sufficient indicia of reliability to be put before the jury.

Finally, the multiple applied to MTX's bills—6.5—is arbitrary by the book's own admission. *See supra* n. 1. There is no way to test the reliability of the multiple West applied to achieve MTX's alleged terminal value. The fact that West testified this was the multiple given to him by the author does not render it receivable by a jury as the basis for a major fact determination. Although experts may rely on the opinion of other experts, I may also assert my gate-keeping role and make an independent evaluation with respect to the reliability and relevance of the bases of West's opinion. *See United States v. Locascio,* 6 F.3d 924, 938 (2d Cir.1993). Here, I find that the facts underlying the selection of the multiple, and assumption that it is applicable, are unsubstantiated, too speculative and lacking in probative force. *See Shu–Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 51–52 (2d Cir.1984) (holding trial court erred in admitting expert testimony based on arbitrary predictions regarding future financials). The multiple here is based on speculation and pure conjecture and therefore inappropriate to put before the jury.

West's omissions are also so significant as to render the valuation irrelevant because it does not "fit" the facts of this case. MTX's financials, management, billing problems—basic due diligence—are important variables to consider in estimating the value of the company and they were not appropriately considered. On this point, the Second Circuit's pronouncement in *Bickerstaff v. Vassar College,* 196 F.3d 435, 449 (2d Cir.1999), is instructive. In *Bickerstaff,* the court affirmed the district judge's exclusion of an expert's statistical report based on the trial court's determination that the report lacked probative value. Recognizing that, as a general proposition, defects in methodology go to the weight of the evidence and not its admissibility, the Second Circuit upheld the trial court's determination that the expert evidence should be excluded not because it "included less than all the relevant variables"—a factor which would go to weight—but because "it omitted the major variables"—which goes to admissibility. *Bickerstaff,* 196 F.3d at 449. Although *Bickerstaff* dealt with statistical regression analysis, its reasoning is applicable to West's report, which fails to consider important financial information, employs a speculative variable and relies on unverified information about "analog" companies (which are only analogs by the *ipse dixit* of West or Nowalsky). The result of such glaring omissions is that the report lacks probative value as to any extended future valuation of MTX.

For the foregoing reasons, as well as those mentioned in my oral ruling at trial, I conclude that West's proffered testimony was so unreliable as to be inadmissible.

So ordered.